UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES HENRY LANTRY, III,<br><br>    *Plaintiff*,<br><br>v.<br><br>FRANK KENDALL, *Secretary of the U.S. Air Force, et al.*,<br><br>    *Defendants*. | Civil Action No. 23-473 (RDM) |

## MEMORANDUM OPINION AND ORDER

Roughly three years ago, Plaintiff Dr. James H. Lantry III, a former extracorporeal membrane oxygenation ("ECMO") physician for the United States Air Force ("USAF"), submitted a request to the USAF for documents pertaining to a USAF review board's finding that Lantry had committed malpractice when caring for a patient during a medical transport in 2014. Dkt. 17 at 20–21 (Def.'s SUMF ¶¶ 1–3). After his request was denied, Plaintiff filed this lawsuit on February 17, 2023 under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(3)(A), and the Privacy Act, 5 U.S.C. § 552a(d)(1), against the USAF, the Secretary of the Air Force, and the Secretary of Defense ("Defendants"). *See* Dkt. 1 (Compl.); Dkt. 2 at 11, 14 (Am. Compl.).

Now before the Court is Defendants' motion to dismiss or, in the alternative, for summary judgment. *See* Dkt. 17. For the reasons that follow, the Court will **GRANT** Defendants' motion for summary judgment as to Plaintiff's FOIA claim. As to Plaintiff's Privacy Act claim, however, the Court cannot determine, based on the present record, whether Plaintiff ever made a request under the Privacy Act or otherwise exhausted his administrative

remedies and, as result, cannot decide, based on the present briefing, whether any such failure to exhaust would pose a jurisdictional hurdle to the Court's adjudication of the claim. The Court will, accordingly, **DENY** this portion of Defendants' motion without prejudice and will **ORDER** Plaintiff to show cause as to why the Court has jurisdiction to hear his Privacy Act claim.

## I. BACKGROUND

### A.   Factual and Procedural Background

In considering a motion to dismiss, the Court must accept as true the factual allegations contained in the complaint, considering the complaint as a whole and including materials attached to or incorporated by reference into the complaint. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015). Materials incorporated by reference may also include documents "not attached by the plaintiff, but . . . 'referred to in the complaint and . . . integral to [the plaintiff's] claim.'" *Banneker Ventures*, 798 F.3d at 1133 (alteration in original) (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)). Here, Plaintiff's original complaint included as exhibits multiple documents, such as Plaintiff's FOIA request and a USAF report to the National Practitioner Data Bank ("NPDB") concerning the USAF's finding of malpractice as to Plaintiff. *See* Dkt. 1 (Compl.). When Plaintiff amended his complaint, however, he did not once again attach these materials to the amended complaint, though he did reference them explicitly. *See, e.g.*, Dkt. 2 at 4 (Am. Compl. ¶ 8) (citing to "Exhibit 4" from the original complaint). The Court will, accordingly, treat the materials that Plaintiff attached to his original complaint and referenced in

his amended complaint as incorporated into the amended complaint for purposes of resolving the Defendants' motion to dismiss.[1]

Considered against this backdrop and viewed in the light most favorable to Plaintiff, the relevant facts are as follows.

On September 4, 2014, Plaintiff was a physician and Captain in the U.S. Air Force, responsible for operating an ECMO device during a medical transport. Dkt. 2 at 4 (Am. Compl. ¶ 5); Dkt. 17 at 20 (Def.'s SUMF ¶ 1). During that transport, a "chemical warming blanket (Ready-Heat Disposable Blanket) was placed on [a] patient's legs," which "caused third degree burns on both [of the patient's] lower legs." Dkt. 1-2 at 3. The patient incurred "wounds, scars and serious nerve damage" as a result of the use of the warming blanket, and she brought a medical malpractice claim against the USAF. *Id.*

When a medical malpractice claim is made against the USAF, the military treatment facility's risk management program is notified. *See* AFI 44-119 at 214 (¶ 10.13.1); *see also* Dkt. 17-1 at 3 (Wolf Decl. ¶ 4 & n.2). Each military treatment facility must have a risk management program that "focuses on identification, mitigation, and prevention of harmful patient and staff events through a process of risk reduction strategies." AFI 44-119 at 187 (¶ 10.2). When a medical treatment facility receives notice of a medical malpractice claim, it secures all relevant documents, AFI 44-119 at 214 (¶ 10.13.1), organizes a Quality of Care ("QOC") review, *id.* (¶ 10.13.3), and makes Standard of Care ("SOC") determinations, *id.* (¶ 10.13.3); *see* Dkt. 17-1 at 3 (Wolf Decl. ¶ 4). An SOC determination is "a peer review of a specific incident of care and

---

[1] The Court also takes judicial notice of certain USAF guidance documents. *See* Department of the Air Force Guidance Memorandum to DAFI 44-119, Medical Quality Operations, https://static.e-publishing.af.mil/production/1/af_sg/publication/afi44-119/afi44-119.pdf (dated August 16, 2011) (hereafter "AFI 44-119"). *See Tellabs, Inc.*, 551 U.S. at 322–23 (permitting a district court to take notice of information available on government websites).

is initiated in response to a concern about individual clinical performance and a potential breach in the standard of care." AFI 44-119 at 150 (¶ 8.14.2). The military treatment facility will also notify all significantly involved practitioners of "their involvement in the medical malpractice claim." *Id.* at 214 (¶ 10.13.4).[2]

The Air Force Medical Practice Review Board ("MPRB") then reviews the actions of all significantly involved practitioners through a process of "expert peer review." AFI 44-119 at 215 (¶ 10.13.10). "Expert peer review" involves "an external peer review of a specific incident of care in preparation for a medical malpractice case against the government." *Id.* at 150 (¶8.14.3); *see* Dkt. 17-1 at 3 (Wolf Decl. ¶ 4). Following this review, the MPRB forwards its SOC determination to the Air Force Surgeon General and makes recommendations about whether to report the incident to the Defense Practitioner Data Bank ("DPDB") and the National Practitioner Data Bank ("NPDB"). AFI 44-119 at 215 (¶ 10.13.10). The process concludes when the Air Force Surgeon General issues a final SOC determination and decides whether to report the event to the DPDB, NPDB, and other official agencies. *Id.* If a significantly involved practitioner is "found not to [have] me[t] the SOC," then the "malpractice claim case[] [is] . . . reported to the NPDB." *Id.* at 217 (¶ 10.17.1).

In considering the medical malpractice claim stemming from the September 4 medical transport, the "peer review board" found that Lantry "committed malpractice" due to his failure to meet standards of care during that medical transport. Dkt. 2 at 4–5 (Am. Compl. ¶ 14); Dkt. 17 at 20 (Def.'s SUMF ¶ 1). He was informed of this finding on October 24, 2018 and advised

---

[2] Those notifications include the "initial determination that a provider is significantly involved," a "[p]reliminary QOC review with SOC determinations made by the [military treatment facility]," "[r]edacted expert reviews done for the attorneys adjudicating the claim, when completed," "[p]rovider's right to respond to any adverse SOC determination," and "final legal and clinical SOC determinations for each malpractice claim." *Id.* at 214 (¶ 10.13.4).

that it was "in [his] best interest to submit a response for re-consideration by the peer expert . . . before final decisions on SOC and reporting are made." Dkt. 1-5 at 1.  In preparing his response, Plaintiff sought information on the specific findings made by the peer review board but alleges that he never received a copy of the relevant documents.  Dkt. 2 at 5–6 (Am. Compl. ¶¶ 15–30).

The process concerning the September 4 medical transport culminated with a finding that Lantry had violated the SOC.  The USAF, accordingly, reported to the NPBD: (1) that the incident occurred, (2) that Plaintiff had been the treating physician, and (3) that the USAF had made a malpractice settlement payment of $150,000 to the patient as a result of the injuries the patient had suffered.  Dkt. 1-2; Dkt. 17 at 20 (Def.'s SUMF ¶ 2).  The USAF also notified Plaintiff's state credentialing authority.  Dkt. 2 at 7 (Am. Compl. ¶ 33); Dkt. 17 at 20 (Def.'s SUMF ¶ 2).

Several years later, on February 5, 2020, Plaintiff submitted a FOIA request to the USAF, requesting "all documents pertaining to the malpractice claim [involving the September 4, 2014 medical transport] collected by the Air Force Medical Practice Review Board . . . that were used to make a determination of medical malpractice for James Henry Lantry III," including "any and all additional documents that were used to make this malpractice decision resulting in submission to the National Practitioner Data Bank."  Dkt. 1-6 at 1; Dkt. 2 at 7 (Am. Compl. ¶¶ 35–36).  Remarkably, as of January 13, 2023, Lantry had yet to receive a response to his February 2020 FOIA request.  Dkt. 1-10 at 1.  Plaintiff thus filed this suit seeking release of the materials he requested.  Dkt. 1 (Compl.).  Plaintiff filed an amended complaint on February 28, 2023, Dkt. 2 (Am. Compl.), which the Defendants have moved to dismiss, or in the alternative, have moved for summary judgment, Dkt. 17.

5

## II. ANALYSIS

A. **Freedom of Information Act Claim**

The Court considers Plaintiff's FOIA claim first. Defendants ask this Court to dismiss or, in the alternative, to grant summary judgment in their favor on the ground that all the records Plaintiff requested are protected from disclosure under FOIA Exemption 3. Dkt. 17 at 9–13. In support of this argument, Defendants rely on a declaration from Colonel Lauren J. Wolf, who is "responsible for the Air Force Surgeon General's Clinical Quality Management program," Dkt. 17-1 at 2 (Wolf Decl. ¶ 1), and also invoke AFI 44-119, which Defendants contend is the principal USAF internal guidance document that pertains to its investigation of medical malpractice claims like the one relevant here.

When considering a motion to dismiss, a court ordinarily must confine itself to the complaint and materials properly incorporated into the complaint. If materials outside of the complaint are considered, "[t]he normal course of action . . . is for a nominal motion to dismiss to be treated as a motion for summary judgment." *Tele-Commc'ns of Key W., Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985); *see also* Fed. R. Civ. P. 12(d) ("If, on a [Rule 12(b)(6) motion], matters outside the pleading are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). In deciding whether it is appropriate to convert the motion from one under Rule 12(b)(6) to one under Rule 56, "the touchstone is fairness and whether consideration of summary judgment is appropriate, in light of the nature of the extra-pleading material submitted, the parties' access to sources of proof, and the parties' concomitant opportunity to present evidence in support or opposition to summary judgment." *Ryan-White v. Blank*, 922 F. Supp. 2d 19, 23 (D.D.C. 2013).

Here, the Court need not convert Defendants' motion to dismiss because they also move, in the alternative, for summary judgment, and, although Defendants have yet to file an answer, Rule 56 permits a party to "file a motion for summary judgment at any time until 30 days after the close of discovery." Fed. R. Civ. P. 56(b). Plaintiff, moreover, does not object to reaching the merits of Defendants' motion for summary judgment at this early stage of the litigation, and the Court sees no unfairness in doing so. *See generally* Dkt. 18. Discovery is exceptionally rare in FOIA cases, *see Voinche v. FBI*, 412 F. Supp. 2d 60, 71 (D.D.C. 2006) ("FOIA actions are typically resolved without discovery."); *Wheeler v. CIA*, 271 F. Supp. 2d 132, 139 (D.D.C .2003) ("Discovery is generally unavailable in FOIA actions."); *Pub. Citizen Health Rsch. Grp. v. FDA*, 997 F. Supp. 56, 72 (D.D.C. 1998) ("Discovery is to be sparingly granted in FOIA actions."), *aff'd in part, rev'd in part*, 175 F.3d 898 (D.C. Cir. 1999), and, here, Plaintiff does not seek discovery. Instead, he merely asserts that he too should be permitted to submit "additional responsive evidence in accordance with FRCP 56." Dkt. 18 at 6. Defendants do not oppose that reasonable request, leaving the Court free to decide the case on the record as it now exists.

To prevail on a motion for summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a FOIA case, a court deciding a summary judgment motion must "ascertain whether the agency has sustained its burden of demonstrating that the documents requested are . . . exempt from disclosure." *ACLU v. U.S. Dep't of Just.*, 655 F.3d 1, 5 (D.C. Cir. 2011) (quotation marks and citation omitted). An agency may do this by submitting declarations that are "relatively detailed and non-conclusory," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation marks and citation omitted), and that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information

withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith," *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).

Defendants withheld the records requested by Plaintiff pursuant to FOIA Exemption 3. Exemption 3 permits the withholding of records that are "specifically exempted from disclosure by statute," provided that such statute either "requires that the matter be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Defendants contend that 10 U.S.C. § 1102 prohibits the disclosure of the records Plaintiff requests and, thus, provides a sound basis for withholding the records under Exemption 3. Dkt. 17 at 9. Section 1102 provides that "[m]edical quality assurance records created by or for the Department of Defense as part of a medical quality assurance program are confidential and privileged" and that "[s]uch records may not be disclosed to any person or entity," except as permitted under certain exceptions. 10 U.S.C. § 1102(a). None of those exceptions apply here, *id.* § 1102(c), and, to the contrary, the statute unambiguously declares that the "[m]edical quality assurance records" protected under § 1102(a) "may not be made available to any person under" FOIA, *id.* § 1102(f). Clearer statutory language is seldom, if ever, found.

According to Defendants, all of the records that Plaintiff requests—that is, "all documents . . . collected by the Air Force Medical Practice Review Board" associated with "the malpractice claim" arising from the September 4, 2014 flight, Dkt. 1-6 at 1—are "medical quality assurance records," as defined by § 1102. Dkt. 17 at 9–10. That is the case, Defendants explain, because, under the terms of the statute, a "medical quality assurance record" includes "proceedings, records, minutes, and reports that emanate from quality assurance program

activities . . . and are produced or compiled by the Department of Defense as part of a medical quality assurance program." *Id.* at 9 (quoting 10 § 1102(j)(2)). A "medical quality assurance program" is, in turn, defined by the statute as:

> [A]ny peer review activity carried out . . . for the Department of Defense to assess the quality of medical care, including activities conducted by . . . review bodies responsible for quality assurance, credentials, . . . and identification and prevention of medical or dental incidents and risks.

*Id.* § 1102(j)(1). The Medical Practice Review Board's process for considering claims of medical malpractice, Defendants argue, meets this definition of a medical quality assurance program. *See* Dkt. 17 at 9–10; Dkt. 17-1 at 3 (Wolf Decl. ¶ 5). The Court agrees.

The process that the MPRB employs to make determinations of malpractice involves the use of "peer expert review." As explained by AFI 44-119, when investigating a claim of medical malpractice, the MPRB uses an "an external peer review of a specific incident of care." AFI 44-119 at 150 (¶ 8.14.3). Those expert reviewers must at "minimum" have "four years [active duty] time, [must have] 4 years experience in [the] clinical specialty, [must be] currently practicing in the clinical specialty," and should "prefer[ably]" have a "board certification/national certification." *Id.* at 212 (¶ 10.11.11.4). The expert review process that the MPRB conducts, accordingly, falls within § 1102's broad definition of peer review, which includes "any assessment of the quality of medical care carried out by a health care professional" and, in particular, "any such assessment of professional performance" and "any patient safety program root cause analysis or report." *Id.* § 1102(j)(4). The Court is hard pressed to see why, given these definitions, the process described by AFI 44-119 for the MPRB's review would not qualify as a medical quality assurance program. Notably, Plaintiff offers no reason to doubt that it does.

If the MPRB's review process, as described by AFI 44-119, qualifies as a "medical quality assurance program," it follows that the records Plaintiff requests are exempt from

disclosure under FOIA. The statute defines "medical quality assurance records" broadly to include any "proceedings, records, minutes, and reports that emanate from quality assurance program activities . . . and are produced or compiled by the Department of Defense as part of a medical quality assurance program." *Id.* § 1102(j)(2). And here, Plaintiff requests all records "collected by the Air Force Medical Practice Review Board . . . that were used to make a determination of medical malpractice" relating to the November 4, 2014 flight. Dkt. 1-6 at 1. Because the MPRB's review is a medical quality assurance program, the records "collected by the [MPRB] . . . that were used to make a determination of medical malpractice," *id.*, would be "records . . . produced or compiled . . . as part of a medical quality assurance program," 10 U.S.C. § 1102(j)(2), and thus medical quality assurance records. In short, Plaintiff's request for records essentially tracks the statutory prohibition on release; he seeks records that are, by definition, medical quality assurance records.

In response, Plaintiff advances two arguments as to why—even if the MPRB process constitutes a medical quality assurance program in some respects—the records he seeks nevertheless fall outside the statutory definition of "medical quality assurance records." First, he contends that the USAF's conclusion that all the records he seeks were "medical quality assurance records" is overbroad because "information existing or originating outside of a quality assurance program *does not* become confidential and privileged merely by incorporating it into a quality assurance record." Dkt. 18 at 15 (emphasis in original) (quoting *Dayton Newspapers, Inc. v. Dep't of Air Force*, 107 F. Supp. 2d 912, 917 (S.D. Ohio 1999)). But that argument ignores the statutory text and the nature of the records that Plaintiff actually seeks. Beginning with the language of the statute itself, § 1102 defines "medical quality assurance record" broadly to include "the proceedings, records, minutes, and reports that emanate from quality assurance

10

program activities . . . and are produced or *compiled* by the Department of Defense as part of a medical quality assurance program." 10 U.S.C. § 1102(j)(2) (emphasis added).  This definition includes materials that did not originate with the quality assurance program but that were collected or assembled as part of the program's peer review process.

To be sure, § 1102(h) clarifies that "[n]othing in this section shall be construed as limiting access to the information in a record created and maintained outside a medical quality assurance program, including a patient's medical records, on the grounds that the information was presented during meetings of a review body that are part of a medical quality assurance program."  But courts, including the one Plaintiff cites for support, have interpreted this section to "make[] clear that an individual is not precluded from obtaining those files *from an outside source* (i.e., a source other than the quality assurance program) simply because they may have been incorporated into a quality assurance record."  *Dayton Newspapers*, 107 F. Supp. 2d at 917–18 (emphasis in original).  Rather than limiting the confidentiality and privilege afforded by § 1102(a) to information that is "produced or compiled" as part of the quality assurance program, § 1102(h) merely clarifies that § 1102(a) does not "limit[] access" to records that are "created *and* maintained outside the quality assurance program." 10 U.S.C. 1102(h) (emphasis added).  Had Congress intended to permit the disclosure of records created outside the program but maintained by the program (or vice versa), it would have used the disjunctive in § 1102(h).  Likewise, had Congress intended to limit the scope of the confidentiality § 1102(a) affords to those only those records both "produced" and "compiled" by the program it would have used the conjunctive, rather than the disjunctive.

Plaintiff's second argument is no more persuasive.  He argues that even if the process outlined by AFI 44-119 does constitute a "medical quality assurance program," Defendants have

11

not met their burden of showing that that process applied to the medical malpractice claim made against him. In support of this argument, Plaintiff notes the reticulate series of events and notifications that are supposed to transpire when a medical malpractice claim is filed. *See* Dkt. 18 at 7–9. He then avers that he was not informed of any of the necessary steps as required by the AFI 44-119 process, which he says indicates that the process outlined by that directive was not the one employed against him and, accordingly, that the records compiled for that process might not qualify as medical quality assurance records. *See id.*; Dkt. 18-1 at 1–2 (Lantry Decl. ¶¶ 6–11).[3] But even viewing Plaintiff's account of these omissions in the light most favorable to him, as the Court must at this stage of the proceedings, *see Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017), any such aberrations do not, alone, establish that the other steps outlined by AFI 44-119—most importantly, the steps pertaining to peer review—were not taken by the MPRB.

As an initial matter, there is ample evidence in the record that a peer expert review consistent with AFI 44-119 occurred. Attached to Plaintiff's first complaint, for example, is an email to Plaintiff from a Risk Manager at the Air Force stating that "[t]he ECMO [Surgeon General] physician expert peer review has just been completed." Dkt. 1-5 at 1. That email goes on to suggest that Plaintiff "submit a response for re-consideration by the peer expert, and review by the MPRB and [the Surgeon General] before final decisions on SOC and reporting are made by the [Surgeon General]." *Id.* Another email purports to contain "the SOC not met," *id.* at 8,

---

[3] Plaintiff specifically notes four aberrations in the process that was followed: (1) the failure to notify him in writing that a claim had been filed (he did not find out until after the peer review panel had met and made their determination), *see* Dkt. 18 at 8; (2) the failure to provide him a particular form (which, on Plaintiff's telling, was required by AFI 44-119, Chapter 8), *see id.*; (3) the failure to provide him a copy of the SOC determination (which, on his telling, was required by AFI 44-119, ¶ 10.11.3), *see id.* at 8–9; and (4) the fact that his superiors were unaware that the QOC proceeding had been initiated, *see id.* at 7.

determination and a discussion about how Plaintiff might best refute that SOC finding follows, *id.* at 8–12. Finally, it is established that a medical malpractice finding was made by the MPRB and that the incident was reported to the relevant professional boards by the Air Force Surgeon General.

Beyond identifying a handful of asserted, procedural irregularities, Plaintiff does not dispute that a peer review actually took place or cite to any evidence to that effect. Instead, he contends that he was not informed, at the time, that a peer review process pursuant to AFI 44-119 was being conducted. But the lack of notification to him (and his superiors) that the peer review process had transpired does not negate the evidence that steps were, in fact, taken consistent with AFI 44-119. And Plaintiff provides no account of how the steps that all parties seem to agree transpired—the SOC finding, the MPRB review, and the report to the professional boards by the Air Force Surgeon General—could have transpired outside of the processes outlined in AFI 44-119.

In her declaration, moreover, Colonel Wolf attests, under the penalty of perjury, that (1) the procedures of AFI 44-119 were followed and (2) "no documents collected or considered by the MPRB [in conducting its QOC review] would fall outside the definition of 'proceedings, records, minutes, and reports . . . produced or compiled' as part of the quality assurance program." *See* Dkt. 17-1 at 4 (Wolf Decl. ¶ 6); *see id.* at 4–5 (Wolf Decl. ¶¶ 4–6). Her declaration, submitted on behalf of an agency, is entitled to "a presumption of good faith, which cannot be rebutted by purely speculative claims." *SafeCard*, 926 F.2d at 1200 (internal quotation marks and citation omitted). Plaintiff, in turn, fails to offer any evidence that would justify negating Colonel Wolf's representation that the MPRB determination involved "peer review activity carried out . . . for the Department of Defense to assess the quality of medical care." 10

U.S.C. § 1102(j)(4). As a result, his argument that the MPRB did not follow the procedures outlined in AFI 44-119 amounts to "purely speculative claims."

For these reasons, the process undertaken by the USAF in investigating the medical malpractice claim against Plaintiff constituted a "medical quality assurance program," and the documents Plaintiff seeks were "produced or complied" for that program. They are, accordingly, protected from disclosure under 10 U.S.C. § 1102(a) and FOIA Exemption 3. With this conclusion in hand, the Court offers two final observations. First, because the documents are, by their very nature, exempted from disclosure, it would not be possible for the agency to segregate and release any non-exempt material from the exempt medical quality assurance records. *See Flete-Garcia v. U.S. Marshals Serv.*, 613 F. Supp. 3d 425, 436 (D.D.C. 2020) (noting that an agency must separate "the exempt from the non-exempt portions of the document" (internal quotation marks and citation omitted)); *Stolt-Nielsen Transp. Grp., Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008). Second, FOIA's foreseeable-harm requirement does not apply to the "disclosure of information prohibited from disclosure by law, or otherwise exempt from disclosure under" Exemption 3. 5 US.C. § 552(a)(8)(B).

The Court will, accordingly, grant summary judgment in favor of Defendants with respect to Plaintiff's FOIA claim.

**B.     Privacy Act Claim**

Plaintiff's amended complaint also contains a Privacy Act claim. The Privacy Act provides that "each agency that maintains a system of records" must, "upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him . . . to review the record and have a copy made of all or any portion thereof in a form comprehensible to him." 5 U.S.C. § 552a(d)(1). Plaintiff alleges that

14

Defendants violated the Privacy Act when they declined to respond to his FOIA request and "produce a complete and unredacted records supporting the conclusion that [he] had engaged in medical malpractice, failed to meet a standard of care, and the decision to report those conclusions to the NPDB." Dkt. 2 at 15 (Am. Compl.). Plaintiff has accordingly brought suit under § 552a(g)(1), which provides that "[w]henever any agency . . . refuses to comply with an individual request under subsection (d)(1) of this section . . . the individual may bring a civil action against the agency." 5 U.S.C. § 552a(g)(1)(B).

Before a person may bring a Privacy Act claim to compel disclosure, however, that person must first exhaust administrative remedies. Many judges in this district view this requirement as jurisdictional. *See e.g.*, *Mulhern v. Gates*, 525 F. Supp. 2d 174, 187 (D.D.C. 2007) ("Premature Privacy Act suits [for improperly withheld documents] are dismissed for lack of subject matter jurisdiction." (citing *Dickson v. Off. of Pers. Mgmt.*, 828 F.2d 32, 40–41 (D.C. Cir. 1987))); *Sandoval v. U.S. Dep't of Just.*, 296 F. Supp. 3d 1, 13 (D.D.C. 2017) ("[T]he exhaustion requirement under the Privacy Act is jurisdictional."); *Stein v. SEC*, 266 F. Supp. 3d 326, 336 (D.D.C. 2017) (same). Others have viewed the exhaustion of the Privacy Act's administrative process as an element of a claim under the Act. *See Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 42 (D.D.C. 2022) ("But the D.C. Circuit has never gone that far [as to call exhaustion a jurisdictional requirement]. It has instead called exhaustion of the Privacy Act's administrative process a 'prerequisite to bringing civil suit to compel amendment' and a 'requirement[]' that has been 'incorporate[d]' into the 'cause[] of action.' (alterations in original) (first quoting *Nagel v. U.S. Dep't of Health, Educ., & Welfare*, 725 F.2d 1438, 1441 (D.C. Cir. 1984); then quoting *Haase v. Sessions*, 893 F.2d 370, 373 (D.C. Cir. 1990))).

This distinction at least arguably matters here because the Court cannot reach the Defendants' arguments relating to the merits of Plaintiff's Privacy Act claim without first ensuring that it has jurisdiction to do so. And nothing in Plaintiff's complaint or attachments thereto indicates that Plaintiff has exhausted his Privacy Act Claim. To the contrary, Plaintiff does not allege that he ever filed a request under the Privacy Act with the USAF, and, based on the Court's review of his request, it appears that he never did so. *See* Dkt. 2 at 7 (Am. Compl. ¶ 35); *id.* at 14–15 (Am. Compl.); Dkt. 1-6 at 1–2. Indeed, his request stated only that "[t]his is a request under the Freedom of Information Act." Dkt. 1-6 at 1.

Exhausting administrative remedies under the Privacy Act requires more than merely asking for the documents. "To properly exhaust administrative remedies, a plaintiff must submit a Privacy Act request to the agency and seek review within the agency under the agency's regulations." *Mulhern*, 525 F. Supp. 2d at 183 (citations omitted); *see e.g.*, *Blazy v. Tenet*, 979 F. Supp. 10, 19 (D.D.C. 1997) (dismissing a Privacy Act claim for failure to exhaust when the plaintiff had not followed agency regulations for how to submit a Privacy Act request, sent a letter requesting documents to the wrong individual, and "nowhere mention[ed] the Privacy Act"); *cf. Dickson*, 828 F.2d at 40–41 (holding that futility does not excuse a failure to exhaust under the Privacy Act). Accordingly, nothing presently before the Court suggests that the process necessary to exhaust a Privacy Act claim was followed by Plaintiff. Or put even more directly, Plaintiff does not allege—and there is no evidence that—he ever made, or that the USAF ever considered and rejected, a request for access to records under the Privacy Act.

Neither party, however, has briefed this issue, and resolving it is necessary before the Court can consider whether Plaintiff has otherwise stated a plausible Privacy Act claim. As a result, the Court will direct that Plaintiff show cause as to why this Court has jurisdiction to

consider his Privacy Act claim.  Defendants may then reply to Plaintiff's response with their view on the jurisdictional issue.  For now, Defendants' motion to dismiss is denied without prejudice as premature.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, Dkt. 17, is **DENIED** without prejudice, and Defendants' motion for summary judgment, Dkt. 17, is **GRANTED** as to Count I. Plaintiff is further **ORDERED** to show cause, on or before April 12, 2024, why the Court has subject matter jurisdiction over Count II of the amended complaint, Dkt. 2.  It is further **ORDERED** that Defendants shall respond to Plaintiff's submission on or before April 26, 2024. Finally, Defendants' motion to dismiss or, in the alternative, for summary judgment, Dkt. 17, as to Count II is **DENIED** without prejudice, pending resolution of the threshold, jurisdictional question.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 31, 2024